IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
　　　　　　　　 )
　　　　　Applicant, )
　　　　　　　　 )
　　vs. )　　　　Civil Action No.
　　　　　　　　 )　　　　01C 9635
SIDLEY & AUSTIN, )
　　　　　　　　 )
　　　　　Respondent. )

**NOTICE OF FILING**

TO:　　John Hendrickson
　　　　Noelle Brennan
　　　　Deborah L. Hamilton
　　　　Equal Employment Opportunity Commission
　　　　500 West Madison Street
　　　　Suite 2800
　　　　Chicago, IL  60661

　　　　PLEASE TAKE NOTICE that on Tuesday, January 8, 2002, we filed with the Clerk of
the United States District Court for the Northern District of Illinois, 219 South Dearborn Street,
Chicago, Illinois, RESPONDENTS' MEMORANDUM IN OPPOSITION TO THE
APPLICATION FOR AN ORDER TO SHOW CAUSE, DECLARATION OF PAUL
GROSSMAN and DECLARATION OF WILLIAM CONLON IN OPPOSITION TO THE
APPLICATION FOR AN ORDER TO SHOW CAUSE, copies of which are herewith served
upon you.

Kevin M. Forde
Janice R. Forde
Kevin M. Forde, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL  60602
(312) 641-1441

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that the foregoing NOTICE OF FILING and RESPONDENTS' MEMORANDUM IN OPPOSITION TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE and DECLARATION OF PAUL GROSSMAN and DECLARATION OF WILLIAM CONLON IN OPPOSITION TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE were served upon counsel noticed this 8th day of January, 2002, BY HAND.

_Janice R. Forde_

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES EQUAL EMPLOYMENT )   No. 01 C 9635
OPPORTUNITY COMMISSION,           )
                                  )   Hon. Joan Lefkow
            Applicant,            )
                                  )   **F I L E D**
      vs.            **DOCKETED**  )
                                  )   JAN 0 8 2002
SIDLEY & AUSTIN,     JAN 2 4 2002 )
                                  )   MICHAEL W. DOBBINS
            Respondent.           )   CLERK, U.S. DISTRICT COURT
                                  )

## RESPONDENT'S MEMORANDUM IN OPPOSITION
## TO THE APPLICATION FOR AN ORDER TO SHOW CAUSE

This memorandum is submitted on behalf of Sidley Austin Brown & Wood[1]

("Sidley"), a general partnership, by its counsel, Paul Grossman and Robert S. Span of Paul,

Hastings, Janofsky & Walker LLP, and Kevin M. Forde and Janice R. Forde of Kevin M. Forde,

Ltd., in opposition to the memorandum of the Equal Employment Opportunity Commission

("EEOC") in support of its Application for an Order to Show Cause as to the enforcement of its

Subpoena No. CH-0217.

## I.    INTRODUCTION

The Order sought by the Chicago District Director of the EEOC is unprecedented

because determinative, undisputed facts in the possession of the EEOC and clear Seventh Circuit

authority demonstrate that the EEOC has no jurisdiction over decisions involving Sidley

---

[1] As of May 1, 2001, Sidley & Austin merged with Brown & Wood and changed its name to
Sidley Austin Brown & Wood. Unless otherwise expressly provided herein, references to
"Sidley" are to the firm as it existed as of the relevant time period – the Fall of 1999.



partners.  The three critical, determinative undisputed facts that demonstrate that Sidley partners are *bona fide* partners and not employees are:

      (1)     Sidley partners own the firm – they have contributed its capital.

      (2)     Sidley partners share in the firm's profits, and are liable for the firm's losses and financial obligations.

      (3)     Sidley partners administer the firm - each can and does bind the firm, and virtually every Sidley partner serves on one or more of Sidley's 25 management and administrative committees.

The EEOC's argument, that this matter raises a simple question of subpoena enforcement, avoids and never addresses: (1) the undisputed facts establishing that Sidley is a partnership in both name and substance; (2) the clear limitation of the coverage of the Age Discrimination in Employment Act (ADEA) to employees, not partnerships and their partners; and (3) the settled line of Seventh Circuit authority refusing to enforce subpoenas where undisputed facts establish as a matter of law that the agency is pursuing an investigation in excess of its jurisdiction.

Sidley has cooperated fully in the EEOC's investigation by producing extensive responsive documents and other information pertaining to the jurisdictional question.  Yet, the EEOC Chicago District Director, despite having received undisputed evidence that conclusively demonstrates that the EEOC has no jurisdiction, and despite the absence of a charge filed by any allegedly aggrieved party, or even by the EEOC itself, has issued a merits subpoena for confidential partnership documents, and now seeks judicial enforcement of that subpoena.

The EEOC should not be heard to argue, as it does, that "a coverage dispute does not provide a legitimate basis for refusing to comply with a subpoena in an EEOC investigation."[2]  That may be true when the material facts are in dispute, but the Seventh Circuit, in the definitive case on the subject, has made clear that *when the determinative facts are not in*

---

[2] EEOC Memorandum, p.10.

*dispute* and statutory coverage/jurisdiction "is a question of law," "regulatory jurisdiction" is "properly addressed at the subpoena-enforcement stage."[3]

Sidley invited – indeed, it challenged – the EEOC to confront and resolve the jurisdictional issue. Because the EEOC declined to do so, that task regrettably falls to this Court.

Sidley demonstrates below that – as a matter of law – the EEOC has no jurisdiction here. No court has ever found a partner in a professional partnership to be a covered "employee" where (as here): the partner shared in the profits and losses of the firm, and was liable for the partnership's debts; the partner contributed significant capital; and the partner could bind the firm and had management/supervisorial responsibilities.

None of the foregoing facts have been – nor credibly could be – disputed by the EEOC. In such circumstances, every reported case has resolved the partner/employee jurisdictional issue as a matter of law, on motion.

This Court should do the same. Because the EEOC, as a matter of law, lacks jurisdiction, its subpoena should not be enforced.

## II.   THE UNDISPUTED FACTS

In September 1999, under authority granted by the Partnership Agreement signed by all partners, Sidley's Executive Committee determined that 32 partners whose contributions

---

[3] *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 491, 492, 495-96 (7th Cir. 1993) (subpoena of Secretary of Labor not enforced based on lack of jurisdiction; facts undisputed; "Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage.").

to the firm were less than expected of Sidley partners should give up their equity status.[4]  The undisputed facts concerning Sidley's organization and structure demonstrate that all of the indicia of a bona fide partnership -- namely, remuneration based on firm performance, ownership and participation in operation -- exist at Sidley.  This, therefore, is not an employment case where the discrimination laws apply, *see, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 76 (1984), but rather an inquiry into a partnership's decisions concerning persons who already were bona fide partners, *id.* at 79 (Powell, J., concurring) (the law does not reach the relationships between existing partners).

All the facts set forth below were provided in all requested detail to the EEOC and have not been disputed by the EEOC in its papers or otherwise.

### A.     Undisputed Fact No. One: Sidley Partners Own The Firm.

Every Sidley partner must contribute capital to the firm, and each has a capital account (which includes contributed capital and rights to accrued accounts receivable).  Each of the 32 affected partners had a capital account.  The average of these 32 capital accounts was $385,552; the total capital held by the 32 was $12,337,664.  (Exhibit A to the Conlon Declaration ("Conlon Decl.") is a table showing the balances of these partners' capital accounts as of December 31, 1999.)

As owners, Sidley partners have access to the firm's financial information.  They have the right to inspect the firm's books and records.  (Conlon Decl., ¶ 4)  Sidley partners receive, or have reviewed with them, firm financial performance information, including: (i)

---

[4] The EEOC spends the first three pages of its Memorandum quoting press reports to make it appear that Sidley's actions were based on the ages of the affected partners.  While we do not believe it appropriate at this stage to engage in an extensive debate on matters irrelevant to the jurisdictional issue, we note that Sidley provided information to the EEOC showing that the decision was not based on age.  Far from evidencing age discrimination, the facts demonstrate that older partners clearly were not targeted: 103 of Sidley's partners over age 50 were not asked to change status; and 13 of the 32 asked to change status were under age 50, including two in their 30's.  (*See* Attachment 1 to the Declaration of Julianne Bowman ("Bowman Decl."), submitted by the EEOC in support of its Application, at p. 30.)  The decision was based on performance.

revenue, bills issued, fees received, time recorded, time written off, accounts receivable (and age

of accounts receivable) and unbilled time; (ii) expense data, including compensation, overhead,

and non-operating expenses; (iii) productivity data, including head count, full-time equivalent

hours, chargeable hours and partner/associate ratios; and (iv) balance sheets containing data

regarding assets, liabilities and capital amounts.  (Conlon Decl., ¶ 4)

This financial information is communicated every month in a summary fashion.

A more detailed analysis and discussion of year-to-date financial performance occurs at least

quarterly.  A copy of the audited financials is supplied to each partner, and additional, very

detailed financial information is presented and discussed at the firm-wide partners' meeting

shortly after the end of the financial year.  (Conlon Decl., ¶ 5)

Each Sidley partner pays his or her own self-employment taxes, including taxes in

other states and countries, as required, in which the firm has offices; pays for his or her own life,

medical, dental, disability and accidental death and dismemberment insurance coverage; and

funds his or her own retirement fund.  The firm does not cover its partners with workers'

compensation or unemployment insurance (which, of course, is provided for its employees).

(Conlon Decl., ¶ 6)

If the firm were dissolved, Sidley's partners would share in the dissolution

proceeds. (Conlon Decl., ¶ 7)

**B.**   **Undisputed Fact No. Two: Sidley Partners Share In Firm Profits And Losses.**

Each Sidley partner is compensated, in whole or in part, based on a share of the

profits of the firm.  If the firm does well, the partner's compensation is greater; if the firm does

poorly, the partner's compensation is less.  The annual participation of each Sidley partner is

based upon that partner's (i) Units; (ii) Percentages, if any (which for compensation purposes are

converted to Unit equivalents -- 1% equals 10 Units); and (iii) Guarantee, if any.[5]  All partners

have Units; some also have Percentages and/or a Guarantee.  Once set, the partner's Units,

Percentages (if any) and Guarantee (if any) are not changed for the year.  There is no bonus or

other supplemental payment; the yearly value of each Unit is a mathematical calculation based

solely on the firm's profits. (Conlon Decl., ¶ 8)

In or about early February of each year, each Sidley partner receives a

compensation memo that (among other things) estimates that partner's projected compensation

for the coming year.  Whether the partner's actual income meets the projection depends on the

firm's economic performance. (Conlon Decl., ¶ 9)

Thus, the remuneration of the 32 former partners, like all partners, varied with the

firm's economic fortunes.  *See* Conlon Decl., ¶ 10 for more detail on how individual income

varied from projected income.

Sidley partners share liabilities in proportion to their ownership interest in the

firm.  (Conlon Decl., ¶ 11)  Sidley partners know first-hand what this means.  In the early 1990s,

Sidley made some difficult decisions that resulted in substantial losses on office leases.  As is

required in a partnership, Sidley partners paid, and are continuing to pay, for those losses.[6]

Issues of financial responsibility also surface every time a claim is made against the firm.  Sidley

carries seven-figure deductibles on its various insurance policies.  This means that the partners

share the risk for this level of "self insurance" in proportion to their ownership interest in the

firm.  Because of these factors, Sidley partners are given formal and informal reports about any

claims against the firm and other risk-management matters. (Conlon Decl., ¶ 11)

---

[5] A copy of the firm's Amended and Restated Partnership Agreement, which was in effect in 1999, was provided to the EEOC.

[6] Each year when Sidley partners receive their compensation-estimate memorandum, they are reminded that such losses, which were amortized over time, have not yet been fully paid and will be deducted from their capital accounts.  For 1999, the aggregated amortized loss was $32 million. (Conlon Decl., ¶ 11)

There could be no more graphic demonstration of the fact that Sidley partners share the firm's financial risks than the events of September 11, 2001. One of Sidley's offices in New York was located on five floors of the World Trade Center. That office was destroyed by the terrorist attack. Although Sidley was fortunate to have lost only one person in the attack, the loss of the office has, of course, caused disruption to the firm's New York operations. The ultimate responsibility for any financial loss will rest with all Sidley partners. (Conlon Decl., ¶ 12)

**C.** **Undisputed Fact No. Three: Each Sidley Partner Participates In The Administration Of The Firm.**

### 1. Each Sidley Partner Can Bind The Firm.

Sidley partners have and regularly exercise the ability to speak for the firm, act for the firm, and bind the firm. Each and every partner (but only a partner) is empowered to sign opinion letters. Sidley partners hire new associates and other employees. Sidley partners enter into contracts on behalf of the firm. Sidley partners have negotiated and signed contracts with clients for equity ownership in their business in payment or partial payment for firm legal services. Sidley partners have negotiated the terms of and signed agreements for services by investment advisory consultants in connection with investment of employee and partner-pension moneys. (Conlon Decl., ¶ 13)

Each and every Sidley partner (but only a partner) is empowered to sign engagement letters, send out bills, and write off unbilled or billed time and expenses. The partner in charge of each matter makes staffing decisions and controls (in consultation with clients) the substantive positions taken in matters. (Conlon Decl., ¶ 14)

### 2. Virtually All Sidley Partners Perform Administrative Functions.

While some smaller partnerships may operate by referendum, Sidley partners, like partners in most large partnerships, have delegated firm management and administration to

committees. The firm has 25 different management and administrative committees.  In accordance with the firm's Partnership Agreement, matters of ultimate partnership governance have been delegated to the Executive Committee.  It is a broad-based committee of partners from throughout the firm.  (Conlon Decl., ¶ 15) There are 34 Partners,  approximately ten percent of all Sidley partners, on the Executive Committee, including partners from every principal domestic office and every major practice area.  Thus, every Sidley partner has easy access to Executive Committee members and can communicate his or her views on issues.[7]  The Executive Committee, as set forth in the Partnership Agreement and in accordance with its fiduciary obligations to its partners, routinely seeks advice from other Sidley partners and is obligated to act in the best interests of the partnership. (Conlon Decl., ¶ 15)

In accordance with the Partnership Agreement, the Executive Committee has appointed a Management Committee, composed of seven members, which administers the day-to-day operating affairs of the firm.  The Executive Committee appoints members to the 23 other administrative committees, each of which, subject to review by the Executive and Management Committees, "is empowered to reach decisions and to act in carrying out its delegated functions." (Conlon Decl., ¶ 16)  Committees manage and administer critical aspects of the firm's operations.  Committees include the Accounting and Finance Committee (oversees nearly one-half billion dollars of billing and collections and an operating budget of approximately $250 million annually), the Computers and Legal Technology Committee (administers an annual budget of $15 million), the Recruiting Committee (makes hiring decisions and extends job offers), and many more.  Virtually all Sidley partners serve on one or more committees.  Almost all of the 32 affected partners served on firm committees.[8] (Conlon Decl., ¶ 17)

---

[7] Sidley's management philosophy is consensus-based decisionmaking.  Sidley encourages individual partners to come forward with initiatives and ideas for addressing both external and internal relationships. Sidley generally does not make its decisions based on a vote of the partners. Instead, advice and factual input from individual partners is sought as a matter of routine. (Conlon Decl., ¶ 18)

[8] A table showing the administrative committee assignments of the 32 is attached as Exhibit B to the Conlon Declaration.

Sidley also has 23 separate substantive practice area groups. The majority of important issues for individual partners arise and are handled at the practice area group level. Each partner in a practice area group has significant input into both the substantive group decisions and the selection of group leaders. Most practice area groups have periodic partner meetings to discuss and decide on a variety of subjects relating to group operations. For example, each practice area group develops a practice development plan for the group with input from all partners in the group. (Conlon Decl., ¶ 19)

The EEOC in its Memorandum argues that its jurisdiction over Sidley could not be decided by motion because a relevant fact was comparative job security between those designated "partners" and those who were concededly employees. Once again, the facts are not in dispute. A partner can be expelled only by a majority vote of those holding percentage interests in the partnership. (Conlon Decl., ¶ 20)  In contrast, non-partner attorneys can be terminated by the partners in the practice area group in the office in which they work. Similarly, non-attorney employees can be terminated by individual partners or appropriate administrative supervisors.[9] (Conlon Decl., ¶ 20)

## III.  PROCEDURAL HISTORY -- SIDLEY HAS PRODUCED ALL REQUESTED INFORMATION EVEN ARGUABLY RELEVANT TO THE JURISDICTIONAL ISSUE.

The Chicago EEOC office *sua sponte* initiated an investigation, purportedly under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), of Sidley's decision that 32 partners were not contributing at the level expected of Sidley partners and must change their status. None of the 32 partners has ever filed a charge of age discrimination,

---

[9] Almost every major law firm in the United States, in order to maintain its competitive position, has had to grapple with the issue of partners whose performance does not meet expectations. *See, e.g., The Graying Of The Bar,* The American Lawyer, June 2000. A 1998 survey revealed that 80% of law firms with more than 100 lawyers have a mandatory retirement age for partners. New York Law Journal, June 11, 1998, p. 1. Sidley does not. It has an "anticipated" age of retirement.

alleged age discrimination, or alleged a lack of partnership status.[10]  Sidley is unaware of any

desire on the part of the affected partners that it disclose highly confidential information

concerning their performance.[11]  Nevertheless, the EEOC sought 29 categories of information

concerning Sidley's organization and structure as a partnership, as well as the reasons

surrounding the change in status of the 32.  On September 12, 2000, Sidley provided an

extensive position statement and documents relevant to the jurisdictional issues -- namely,

information showing that Sidley is a partnership and that, therefore, the EEOC has no

jurisdiction over decisions affecting Sidley partners.  (*See* Sidley's September 12, 2000,

response, attached as Attachment 3 to the Bowman Declaration)  The EEOC asked that Sidley

provide a further response and Sidley did so.  (Bowman Decl., Attachment 5)  On April 10,

2001, the EEOC served yet another Request for Information and Documents, and Sidley on June

1, 2001, responded with additional detailed information and documents relating to the

jurisdictional issue.  (Bowman Decl., Attachment 7)

   On June 19, 2001, representatives of Sidley met with John Rowe, the EEOC's

Chicago District Director, to discuss Sidley's responses to the EEOC's requests and to answer

any questions he might have.  Sidley again confirmed its absolute commitment to provide the

EEOC with all information arguably relevant to the issue of whether the Sidley partners "really"

are partners and whether the EEOC has jurisdiction.  (Bowman Decl., Attachment 8)  Sidley

---

[10] The EEOC, in the Declaration of the Deputy District Director filed in Support of Application for Order to Show Cause, stated that Sidley had been notified of a "Charge of Discrimination". (Bowman Decl., ¶ 4a)  Sidley by letter asked the EEOC to clarify to this Court that no such charge has ever been filed.  The Chicago District Office acknowledged that there have been no charges:  "No partner or former partner of Sidley & Austin has . . . filed a charge of discrimination based on the 1999 partner demotions and changes in the retirement age . . . ." Letter from Deborah L. Hamilton, Trial Attorney, Chicago District Office, EEOC, to Paul Grossman, dated December 27, 2001.  (Grossman Decl., Exhibit A)  Contending that it had not implied the contrary to this Court, the letter concluded:  "EEOC will file no clarifying document with the Court."

[11] The subpoena invades significant privacy rights of Sidley and its present and former partners. For this additional reason, the subpoena should not be enforced.  *See Commodity Futures Trading Comm'n v. Collins*, 997 F.2d 1230, 1233 (7th Cir. 1993) (the district court abused its discretion in enforcing an agency's subpoena of tax returns).

reviewed its previous answers to the Commission's requests to ensure that it had provided everything the EEOC had asked for that was reasonably available and relevant to the jurisdictional issue.  On September 6, 2001, Sidley provided additional information to the EEOC. (Bowman Decl., Attachment 9)  Sidley on multiple occasions invited the EEOC to articulate how any of the requests not answered, which essentially sought information about the performance issues of the 32 partners, were relevant to the jurisdictional issue.  The EEOC never made a contention that any of the information not provided was relevant to the jurisdictional issue, arguing only that it had a right to all requested information.[12]  Despite the fact that all of the information in the possession of the EEOC unequivocally demonstrates that Sidley is a bona fide partnership, on October 23, 2001, the EEOC issued the instant subpoena, seeking detailed disclosure of confidential information relating to the 32 partners.

In a final attempt to demonstrate to the EEOC that it did not have authority to proceed, Sidley filed, in both the Chicago office and the Washington, D.C. headquarters, a Petition to Revoke or Modify the Subpoena.  (Bowman Decl., Attachment 11)  The EEOC headquarters informed Sidley in writing that subpoena enforcement matters are within the sole discretion of the District Director who issued the subpoena.  (Grossman Decl., Exhibit B)  The Chicago District Director's response to the Petition was the instant action to enforce the subpoena.

---

[12] EEOC, however, now contends for the first time (Memorandum, pp. 18-19) that the subpoena should be enforced because the information relating to the performance of the 32 partners is relevant not only to the merits but to the issue of jurisdiction.  Whatever might be the validity of the point in some other case, it is irrelevant here.  The Court is invited to consider, demand by demand, the only subpoenaed documents not produced, items 3-9, reproduced at pp. 7-9 of the EEOC's Memorandum.  All plainly relate to the partnership's business decision regarding the 32; none has anything to do with whether the 32 were bona fide partners beforehand.

## IV.  THE SUBPOENA SHOULD NOT BE ENFORCED BECAUSE EEOC LACKS JURISDICTION

The EEOC subpoena should not be enforced because the EEOC does not have jurisdiction.  Undisputed facts and clear Seventh Circuit authority establish that Sidley partners are just that -- partners.  And the EEOC is wrong in asserting that the Court should ignore the jurisdictional issue.  In effect, the Chicago District Director is taking the position that no one -- not this Court, not the Seventh Circuit, and not the Supreme Court -- should consider the clear lack of jurisdiction.  He is wrong.

### A.  EEOC Erroneously Would Put The Cart Before The Horse; This Court Should Resolve The Clear-Cut Jurisdictional Issue First.

The EEOC suggests that this Court should ignore the jurisdictional issue and enforce the subpoena.  But as the Seventh Circuit has explained, an EEOC subpoena is enforceable only if it "seeks reasonably relevant information, is not too indefinite, and *relates to an investigation within the agency's authority.*"  *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995) (emphasis added).  The central issue, therefore, is whether this subpoena "relates to an investigation within the agency's authority."

The EEOC's authority is limited by 29 U.S.C. § 626(a) to those investigations which are "necessary or appropriate" for the administration of the ADEA.  Because the ADEA does not cover decisions about bona fide partners, the EEOC's investigation is neither necessary nor appropriate for the administration of the ADEA.  Rather, it is entirely *ultra vires*.  As noted in a case later relied upon by the Seventh Circuit (*see infra*), *EEOC v. Ocean City Police Dep't*, 820 F.2d 1378, 1380 (4th Cir. 1987), "it is beyond the authority of [the] EEOC to investigate charges which cannot be pursued." (*Vacated on other grounds*, 486 U.S. 1019 (1988).)

The Seventh Circuit has long held that, when the facts are not in dispute, "[a] district court ruling on an enforcement application will consider a challenge on purely legal grounds to the agency's authority to issue a subpoena." *Squillacote v. Int'l Bhd. of Teamsters,*

*Local 344*, 561 F.2d 31, 40 (7th Cir. 1977) ("The adjudication of a coverage issue in the subpoena-enforcement proceeding *when the facts are not in dispute* does not conflict with the statutory scheme."); *see also Jewel Cos., Inc. v. Fed. Trade Comm'n*, 432 F.2d 1155, 1159 (7th Cir. 1970) (district court may determine the agency's authority when question is inherently legal, does not involve the agency's expertise and does not involve disputed facts). That power to review jurisdictional issues logically must exist, given "Congress' desire to prevent the Commission from exercising unconstrained investigative authority." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 65 (1984).

The Seventh Circuit's decision in *Reich v. Great Lakes Indian Fish & Wildlife Commission*, 4 F.3d 490 (7th Cir. 1993), is directly on point. In that case, the Department of Labor asked the district court to enforce a subpoena directed against the Great Lakes Indian Fish and Wildlife Commission, seeking evidence that the Commission had violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*[13] The district court refused to enforce the subpoena on the ground that the Wildlife Commission is not subject to the Act. *Id.* at 491. On appeal, the Department of Labor made the same argument that the EEOC makes here: the court should have enforced the subpoena without resolving the question of statutory coverage.

The Seventh Circuit disagreed. Noting that the "question of statutory coverage is independent of any information that the subpoena might produce, as it is a question purely of law," Judge Posner wrote that the respondent "should not be burdened with having to comply with a subpoena if, as the district court believed, the agency issuing it has no jurisdiction to regulate the wages that the Commission pays. Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage." *Id.* at 491-92. The court then found that, based on undisputed facts, the Department of

---

[13]    The EEOC's investigatory authority under the ADEA also is based upon the relevant provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 209, 211, which is incorporated by reference in the ADEA, 29 U.S.C. § 626(a).

Labor did *not* have jurisdiction to regulate the Wildlife Commission employees, and accordingly refused to enforce the subpoena. *Id.* at 495-96.

In *Reich*, the Seventh Circuit relied on *Ocean City*, *supra*, in which the Fourth Circuit had denied the enforcement of an EEOC subpoena. 820 F.2d at 1382. That court explained:

> Ordinary logic indicates that it is beyond the authority of EEOC to investigate charges which cannot be pursued. *EEOC is not empowered to conduct general fact-finding missions concerning the affairs of the nation's work force and employers.* The only legitimate purpose for an EEOC investigation is to prepare for action against an employer charged with employment discrimination, or to drop the matter entirely if the Commission finds the charge to be unfounded. *But if no action can be taken on the charge, there is no justification for an investigation absorbing the resources of both the employer and the Commission.*

*Id.* at 1380 (emphasis added).[14]

The latter point -- consumption of resources -- bears emphasis. As the Seventh Circuit stated, in refusing to enforce a Department of Labor subpoena, "Compliance with a subpoena is a burden, and one that a person or institution that can show it is not subject to the regulatory regime in aid of which the subpoena was issued should not be required to bear." *Great Lakes*, 4 F.3d at 492 (emphasis added). Sidley has shown just that. The enforcement of the employment discrimination laws will not be impaired if the Court rules here that the EEOC is acting outside its jurisdiction; to the contrary, prompt resolution of the jurisdictional issue here

---

[14] *See also Interstate Commerce Comm'n v. Piggy Back Shippers Ass'n*, 704 F.2d 533, 534-36 (11th Cir. 1983) (denying enforcement of an administrative subpoena because the respondent was not subject to the administrative agency's grant of statutory authority); *Burlington N. R.R. Co. v. Office of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 643 (5th Cir. 1993) (when an investigation exceeds the statutory authority granted to an agency, subpoenas related to that investigation are ultra vires, and cannot be enforced); *Gen. Fin. Corp. v. Fed. Trade Comm'n*, 700 F.2d 366, 369 (7th Cir. 1983) ("[T]here is no doubt that a court asked to enforce a subpoena will refuse to do so if the subpoena exceeds an express statutory limitation on the agency's investigatory powers.") (citations omitted). The constitution can be implicated, too; the Fourth Amendment requires, among other things, that "the inquiry is within the authority of the agency." *Reich v. Montana Sulphur & Chem. Co.*, 32 F.3d 440, 448 (9th Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950)).

might have the salutary effect of causing the EEOC to redeploy its scarce resources to *employment* cases over which it *does* have jurisdiction.

The EEOC's principal contention (Memorandum, p. 13) in essence is that the wheels of administrative justice would grind to a halt if this Court or others pause to consider whether the EEOC is acting outside of its jurisdiction.  Contrary to the EEOC's argument, Sidley is not advocating a rule of law that would require a court to consider "every possible defense" to the merits of a charge before enforcing a subpoena.  First, jurisdiction is not a "defense." Second, Sidley is not even suggesting that every jurisdictional question should be litigated in a subpoena-enforcement proceeding.  Doubtless there may be some questions that involve material disputed facts so that it would be an undue burden to litigate jurisdiction as a threshold matter. Here, however, Sidley is not asking the Court to conduct a trial, but rather to rule as a matter of law based on the undisputed facts presented.  The EEOC erroneously contends (pp. 16-17) that the evaluation of "employee" status requires a fact-intensive, "case-by-case analysis."  Here the EEOC ignores the reported cases.  There is nothing complicated, let alone fact-intensive, about the jurisdictional issue here.  As shown in Section B below, no reported case has found *even a triable question* of "employee" status where a partner:

- Shares in a firm's profits and losses;
- Has a capital account (i.e., owns a portion of the firm); and
- Participates in managing/administering/supervising and can bind the enterprise.

All of those facts (and more) exist here, *and they are undisputed.*  No delay will occur and no impediment to legitimate law enforcement will arise if this Court rules as a matter of law on the undisputed facts here presented.

The cases cited by the EEOC are inapposite.  In *EEOC v. Tempel Steel Co.*, 814 F.2d 482 (7th Cir. 1987), the court declined to look into the merits of a respondent's defense.  In that case, however, there were disputed questions of triable fact.  What is important is that the Seventh Circuit noted that the result could be different "if the party under investigation were able

to establish that there was clearly no factual or legal support for the agency's preliminary determination to investigate." *Id.* at 485; *see also EEOC v. Roadway Express, Inc.*, 750 F.2d 40, 42 (6th Cir. 1984) (same). Sidley here has so established.

The case that the EEOC chiefly relies upon, *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928 (8th Cir. 1985), if anything, supports Sidley's position. In that case the respondent accounting firm refused to comply *at all* with the subpoena -- it did not even provide records and information relevant to the jurisdictional question. Even under these extreme facts, the decision on appeal was 2-1. The majority opinion emphasized the necessity of enforcing the subpoena so that the EEOC would have the facts necessary to resolve the jurisdictional issue. *Id.* at 930. Here, by contrast, Sidley has willingly produced such information.[15]

## B.    EEOC Lacks Jurisdiction Because Sidley's Partners Are Not "Employees" Protected By The ADEA.

The ADEA applies only to decisions involving "employees" of an "employer."[16] 29 U.S.C. §§ 623, 630. The ADEA defines "employee" as "an individual employed by an employer." 29 U.S.C. § 630(f).

The 32 former partners at issue here were not "employees." Every reported case involving a person sharing in profits (and responsible for losses), holding an equity interest in the

---

[15] EEOC's other principal authorities also are inapposite. *See, e.g., Am. Int'l Trading Co. v. Bagley*, 536 F.2d 1196, 1197 (7th Cir. 1976) (case was not a subpoena enforcement action but "utterly frivolous" lawsuit seeking to bar a proper investigation); *Commodity Futures Trading Comm'n v. Tokheim*, 153 F.3d 474, 478 (7th Cir. 1998) (commodities case; "[T]his is not an instance of impermissible overreaching."); *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) (EEOC subpoena not enforced; undisputed facts establish lack of jurisdiction); *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 924 (11th Cir. 1991) (EEOC must be allowed to investigate the facts relevant to jurisdiction).

[16] EEOC (pp. 9, 13) relies on the statutory definition of "employer," noting that it includes a "partnership." EEOC misses the point. Sidley is not contending that it is not an *employer* with respect to its many employees; rather, it has demonstrated that its former partners are not covered *employees*.

firm, and playing some managerial, administrative or supervisorial role, has held as a matter of law that the individual is not an "employee" protected by the discrimination laws.[17]

For example, the Seventh Circuit has held that partners in an accounting firm cannot be regarded as employees because of their unique status as business owners and managers, and their right to share in the profits and losses. *Burke v. Friedman*, 556 F.2d 867, 869 (7th Cir. 1977). The court stated: "Partners manage and control the business and share in the profits and losses. In light of the foregoing, we do not see how partners can be regarded as employees rather than as employers who own and manage the operation of the business." *Id.* (citations omitted).

The Seventh Circuit applied the same reasoning in *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir. 1984), in which it held that shareholders in a professional corporation engaged in the practice of law are not "employees" for purposes of determining whether the corporation was an "employer." *Id.* at 1178. The court stated that the role of "a shareholder in a professional corporation is far more analogous to a partner in a partnership than it is to the shareholder of a general corporation." *Id.* The court reasoned that the "economic reality of the professional corporation in Illinois is that the management, control, and ownership of the corporation is much like the management, control and ownership of a partnership." *Id.*; *accord Schmidt v. Ottawa Med. Ctr.*, 155 F. Supp. 2d 919, 922 (N.D. Ill. 2001) (the plaintiff, a member of a professional corporation, was not covered by the ADEA, even though he had signed an employment contract which referred to him as an "employee").

Numerous other courts have held that partners do *not* qualify as "employees" covered by the discrimination laws. *E.g., Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398, 1401 (11th Cir. 1991) ("a partner [is] not . . . entitled to sue under the ADEA); *Wheeler v. Hurdman*, 825 F.2d 257, 277 (10th Cir. 1987) ("[B]ona fide general partners are not employees under the

---

[17] EEOC (p. 14) mischaracterizes Sidley's argument to be that "just because . . . partners carry the title 'partners,'" there is no jurisdiction. That is incorrect; a title without more, of course, is not determinative. Sidley's position here is not based on the *title* partner, but on the undisputed facts demonstrating the *reality* of bona fide partnership.

Anti-Discrimination Acts."); *Serapion v. Martinez*, 119 F.3d 982, 990 (1st Cir. 1997) ("[T]he

critical attributes of proprietary status involve three broad, overlapping categories:  ownership,

remuneration, and management.").

　　　　Set forth below is a listing of *every case* of which we are aware deciding whether

an individual designated a partner in a professional organization is covered by the discrimination

laws.[18]  The conclusion is plain: Where ownership, profit remuneration and management/

administration/supervision are present, the courts *as a matter of law*, on motion, have held the

individual to be a bona fide partner.

| CASE | PROFESSION | HOLDING | DECIDED BY TRIAL OR MOTION | KEY FACTORS |
|---|---|---|---|---|
| *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir. 1987) | Accounting | Partner – case dismissed | Motion | Percentage partner; liable for debts; rejecting "domination by autocratic managing partner/CEO" argument |
| *Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398 (11th Cir. 1991) | Law | Partner – case dismissed | Motion | Percentage partner: "Domination by an 'autocratic' partner . . . does not support a finding that the others are 'employees.'" |
| *Rhoads v. Jones Fin. Cos.*, 957 F. Supp. 1102 (E.D. Mo.), *aff'd*, 131 F.3d 144 (8th Cir. 1997) | Financial | Partner - case dismissed | Motion | Percentage partner; liable for debts; "not personally involved in business decisions of the partnership" argument rejected |
| *Serapion v. Martinez*, 119 F.3d 982 (1st Cir. 1997) | Law | Partner - case dismissed | Motion | Percentage partner; liable for debts; rejecting "lack of effective power" argument |
| *Burke v. Friedman*, 556 F.2d 867 (7th Cir. 1977) | Accounting | Partner - case dismissed | Motion | Share of profits and losses |
| *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir. 1984) | Law | Partner - case dismissed | Motion | Shareholder in law corporation was more like partner than employee |
| *Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1996) | Accounting | Employee - discrimination found | Motion | No share of profits; "an annual salary"; "not one cent" in capital |
| *Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F. Supp. 144 (S.D.N.Y. 1987) | Accounting | Employee - can sue for discrimination | Motion | Title not controlling:  "'Profit sharing is the primary attribute of partnership;'" here, no evidence that salary varied with profits |

---

[18] The table does not include a line of cases based on *Hyland v. New Haven Radiology Associates, P.C.*, 794 F.2d 793 (2nd Cir. 1986), which held that use of a corporate form precludes further inquiry into the economic realities of  the shareholder's status.  The Seventh Circuit rejected this reasoning in *EEOC v. Dowd & Dowd, Ltd.*, 736 F2d 1177 (7th Cir. 1984).

| CASE | PROFESSION | HOLDING | DECIDED BY TRIAL OR MOTION | KEY FACTORS |
|---|---|---|---|---|
| *Schmidt v. Ottawa Med. Ctr.*, 155 F. Supp. 2d 919, 921 (N.D. Ill. 2001) | Medical | Shareholder like partner – case dismissed | Motion | "Share in the losses and profits"; lack of control/domination argument rejected; "The Seventh Circuit has held that true partners . . . cannot be regarded as employees." |
| *Holland v. Ernst & Whinney*, 44 Fair Empl. Prac. Cas. (BNA) 474 (N.D. Ala. 1984) | Accounting | Partner - case dismissed | Motion | Partner for 11 years was employer, not employee |
| *Frasca v. Jones, Day, Reavis & Pogue*, Los Angeles Superior Court Case No. BC 169886 (1999)[19] | Law | Partner - summary judgment granted | Motion | "All-powerful managing partner" argument rejected; capital contribution, profit and loss sharing, and participation in supervision/management determinative |
| *Baker v. Berger*, 2001 U.S. Dist. LEXIS 14081 (N.D. Ill. 2001) | Physician | "Partner" – case dismissed | Motion | Physician, sole shareholder in a medical corporation is an employer;  physician exerted control over clinic employees; drawing a salary does not defeat employer status |
| *Devine v. Stone, Leyton & Gershman, P.C.*, 100 F.3d 78 (8th Cir. 1996) | Law | Partner – case dismissed | Motion | Compensation based on firm profits; participation in management decisions and setting of firm policy; contributions to firm capital; responsibility for firm debts |
| *Reddy v. Good Samaritan Hospital & Health Center*, 137 F. Supp. 2d 948 (S.D. Ohio 2001) | Physician | Partner – case dismissed | Motion | Significant management control; profit sharing |
| *Saxon v. Thompson Orthodontics*, 71 F. Supp. 1085 (Kan. 1999) | Physician | Partner – case dismissed | Motion | Percentage profit/loss sharing despite taxes withheld; participated in management decisions and set firm policy |
| *Maher v. Price Waterhouse*, 1985 U.S. Dist. LEXIS 20964 (E.D. Mo. 1985) | Accounting | Partner | Motion | Signatory of partnership agreement; partners admitted by 2/3 vote and expelled by ¾ vote; majority vote management; policy board members removable by partner vote |
| *Moebus v. Ob-Gyn Asociates, Inc.*, 937 F. Supp. 867 (E.D. Mo. 1996) | Physician | Partner – case dismissed | Motion | Equal vote in all major firm decisions; reported only to board; set own schedule; percentage profit/loss sharing |
| *Orton v. Pirro, Collier, Cohen, Crystal, & Block*, 1996 U.S. Dist. LEXIS 437 (S.D.N.Y. 1996) | Law | Partner – case dismissed | Motion | Status as business owners and managers of firm |

---

[19] A copy of this unpublished opinion, previously submitted to the EEOC, is attached to the Declaration of Paul Grossman as Exhibit D.

All of the key factors are present here.  First, each of the 32 affected partners had invested capital in the firm.  Such capital accounts are "powerful indications" of partnership.  *See Serapion*, 119 F.3d at 991 ("The factors relevant to ownership . . . provide powerful indications that the [plaintiff] should not be treated as an employee for Title VII purposes."[20]

Second, as shown above, the compensation of the 32 (like all other Sidley partners) was dependent on the firm's profitability.  "To the extent that a partner's remuneration is subject to the vagaries of the firm's economic fortunes, her status more closely resembles that of a proprietor . . . ."  *Id.*, 119 F.3d at 990.  Indeed, "'Profit sharing is the primary attribute of partnership.'"  *Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F. Supp. 144, 149 (S.D.N.Y. 1987) (citation omitted).

Employees are not liable for the losses of their employers.  Sidley partners are liable for the firm's obligations and losses.  This is a critical factor:

> The central problem with the approach by . . . the EEOC . . . is that it either ignores or relegates to insignificance the economic reality of partnership status itself.  We view that as a fatal flaw.  Status as a general partner carries important economic reality as well.  Employees do not assume the risks of loss and liabilities of their employers; partners do.  It is no small thing to be exposed to unlimited liability, to be personally at risk for a partner's mistakes . . . .

*Wheeler*, 825 F.2d at 274.

Third, Sidley partners can bind the firm.  This is an important factor in establishing partnership status.  *Serapion*, 119 F.3d at 990 ("[R]elevant factors include . . . the ability to act for the firm and its principals"; such a factor indicates "a proprietary role").

---

[20] In addition, like all Sidley partners, the 32 partners affected by the decisions in 1999 were treated like owners, not employees.  They paid federal self-employment taxes as well as taxes in states other than their state of residence and in other countries; they paid for their own health, life and disability insurance; they made their own pension contributions (at levels not available to employees); and they were not covered under other plans for "employees," such as workers compensation and unemployment insurance.  *See Rhoads v. Jones Fin. Cos.*, 957 F. Supp. 1102, 1108 (E.D. Mo.) ("[C]essation of withholding taxes for plaintiff subsequent to plaintiff becoming a 'general partner' is [a] further indici[um] of partner status."), *aff'd*, 131 F.3d 144 (8th Cir. 1997).

Virtually all Sidley partners serve on one or more of the 25 firm administrative committees and fulfill other management, administrative, or supervisorial functions. This also supports partner status. *Wheeler*, 825 F.2d at 274 ("Other common characteristics of partnerships are . . . the right to share in management subject to agreement among the partners. These are economic realities, and no definition of 'employee' is coextensive.") (footnote omitted).

The EEOC principally contends (p. 21) that "[a]ll of Sidley's partners are not equal." According to the EEOC, the firm is dominated by its Executive Committee, consisting of 34 partners, and this domination is shown by the fact that, with the exception of the merger between Sidley & Austin and Brown & Wood, partners do not cast formal votes. This so-called "domination" theory has been repeatedly rejected by the courts and never accepted.

The decision of Sidley partners to delegate authority to a large, representative Executive Committee does not negate Sidley's partnership status. Most major professional partnerships delegate all or nearly all ultimate management decisions to a managing partner or to a committee. Sidley is no exception. Under the Partnership Agreement, Sidley partners have delegated to their Executive Committee the authority to make governance decisions on their behalf and on behalf of the firm.[21]

The act of delegation of some management authority is itself an exercise of managerial authority. Numerous courts have considered whether partners in large firms who have an ownership interest in their firm, are liable for its debts, and are paid a share of the profits, surrender their partner status for purposes of the antidiscrimination laws when they delegate authority to a managing partner or committee (the aforementioned "domination theory"). As set forth below, every court has held they do not.

---

[21] *See Day v. Sidley & Austin*, 394 F. Supp. 986, 994 (D.D.C. 1975) (dismissing breach of contract, breach of fiduciary duty and fraud claims by former partner and holding that the firm's Partnership Agreement delegates to the Executive Committee "wide ranging authority with regard to firm management"), *aff'd,. Day v. Avery*, 548 F.2d 1018 (D.C. Cir. 1976).

The firm in the oft-cited case of *Wheeler*, for instance, looked much less like a partnership than Sidley. It had 80 offices. It was "centrally managed." There was a single "managing partner/CEO" who ran the firm. "[V]otes [were] primarily for the purpose of ratifying decisions [already] made by the managing partner, policy board, or 'nominating' committee." 825 F.2d at 261-62. The plaintiff, at the lowest tier of the partnership (she had made partner just the year before), contended that she was, for legal purposes, a mere employee. The court discussed at great length -- and rejected -- the plaintiff's "domination" theory (that if the firm delegated major management functions to a dominant managing partner or a dominant committee, it was not a true general partnership):

> The heart of the standard proposed to us is a theory that any individual who is organizationally or economically dominated is an employee. In applying the domination theory to partnerships, there is an underlying assumption by its proponents that a "true" general partnership operates like a New England town meeting; that "true" general partners are not employees because they personally control management of the business and their own affairs within the business; that "true" general partners are not "dominated"; they are not controlled; they enjoy equality of bargaining power. Presumably, a "true" partner is not only heard at partnership meetings but actually controls the result as it affects that partner.
>
> *With due respect, those arguments and assumptions are not likely to translate to the real world* with any discernable limits. . . .
>
> "Domination" of a partner in assignment and supervision of work, billing, share of profits, and other matters can result from a myriad of wholly practical reasons existing from time to time in any partnership. . . .
>
> Thus, as stated, there is no way of applying the "domination" standard of reality urged upon us without including virtually every partnership in the United States . . . .

*Id.* at 273 (emphasis added; footnote omitted). The touchstone, the court stated, is economics, not the choice of governance:

> The central problem with the approach [of the EEOC in an amicus brief] is that it either ignores or relegates to insignificance the economic reality of partnership status itself. We view that as a fatal flaw. Status as a general partner carries important economic reality as well. Employees do not assume the risks of loss and liabilities of their employers; partners do. It is no small thing to be exposed to unlimited liability, to be personally at risk for a

> partner's mistakes, and to have one's share of profits always potentially conditional upon the outcome of claims, suits, and obligations generated by another partner. . . .
>
> Other common characteristics of partnerships are profit sharing; contributions to capital; part ownership of partnership assets, including a share of assets in dissolution of the enterprise; and the right to share in management subject to agreement among the partners.

*Id.* at 274 (footnote omitted). All of the attributes in the last paragraph apply to Sidley partners.

*Wheeler* rejected another argument the EEOC made in that case and makes here. The EEOC argues at footnote 3 that "some partners of Sidley (those serving on the Management and Executive committees) [may be real partners, but] other partners are employees." The EEOC appears to argue that partners at Sidley drift into and out of partnership status depending upon the committee to which they are assigned. This preposterous position was explicitly rejected in *Wheeler*:

> [T]he status of partner is permanent while the envisioned "employee" status is a transient overlay. . . . A potentially chaotic situation is presented with partners drifting into and out of covered "employee" status, remaining partners all the while, with no one ever quite knowing who is an employee/partner and who is a "pure" partner.

*Id.*

Similarly, in *Fountain*, the plaintiff argued that he was an employee and not a partner because he had no control, citing "the 'autocratic' manner of control exercised by [the] President." 925 F.2d at 1401. But the court reasoned that "assertions of [the President's] 'autocratic' manner of control do not create a genuine issue of material fact or a reasonable basis for inferring that [plaintiff] was a mere employee." *Id.* The court cited *Wheeler*, 825 F.2d 273-74: "Domination by an 'autocratic' partner over others is not uncommon and does not support a finding that the others are 'employees.'"

The plaintiff in *Serapion* also claimed a total absence of control. With respect to the plaintiff's "domination" argument, the First Circuit held:

> [T]his constellation of complaints [about lack of control and power] assumes that all partners except those equivalent in stature and authority to the most powerful partners of a law firm are

> employees for Title VII purposes.  The assumption lacks any solid
> legal underpinning.  A person with the requisite attributes of
> proprietary status is properly considered a proprietor, not an
> employee, regardless of the fact that others in the firm may wield
> more power.

119 F.3d at 992.  The court continued:

> Within the structure of any organization, certain individuals tend to
> dominate others . . . .  [I]n all events, the exercise of hegemony by
> one partner does not automatically dislodge others in the hierarchy
> from proprietary status.  Elsewise, all partners in a law firm or an
> accounting practice, save only the managing partner(s) would be
> treated as employees for Title VII purposes regardless of the extent
> of their ownership or the correlation between their remuneration
> and the entities' profits.  The law is to the contrary . . . .

*Id.* (citation omitted).  Accordingly, summary judgment against plaintiff was affirmed.

And, in *Rhoads* the plaintiff contended that she was "not really" a partner because

of the domination by the managing partner and because "she was never 'given the opportunity'

to vote on [meaningful] matters . . . ." 957 F. Supp. at 1107.  The *Rhoads* court acknowledged

the managing partner's absolute powers.  *Id.* at 1105.  But *Rhoads* found it more important that

the plaintiff made capital contributions and enjoyed a share in firm profits:

> [P]laintiff had a bona fide ownership interest in the partnership in
> that she made periodic capital contributions to the partnership. . . .
> [P]laintiff here shared in the profits of the partnership . . . .
> Plaintiff here also shared in the losses of the partnership.
>
> \* \* \* \*
>
> Plaintiff does not contest that she made capital contributions . . .
> and was distributed profits according to her ownership interest in
> the firm.  Such investment in the partnership and correlating
> compensation are indicia of partner status.

*Id.* at 1107, 1108.  The court concluded:

> The sum of plaintiff's argument is that she cannot be considered a
> general partner inasmuch as she was not personally involved in
> business decisions of the partnership and was controlled in her
> work by other general partners.  This argument was raised and
> rejected in *Wheeler* . . . .
>
> \* \* \* \*
>
> The court's observations in *Wheeler* are equally applicable here.
> Although plaintiff did not participate in the micro-management of
> the partnership and was not involved in most of the day-to-day

> affairs of the partnership's business, plaintiff nevertheless enjoyed the benefits of numerous and significant attributes of partner status. Possessing a few indicia of employee status did not destroy plaintiff's status as a partner.

*Id.* at 1109-10. Accordingly, summary judgment was granted against plaintiff.

*Simpson v. Ernst & Young*, 850 F. Supp. 648 (S.D. Ohio 1994), *aff'd*, 100 F.3d 436 (6th Cir. 1996), is the only appellate case ever to find an alleged partner to be a partner in name only, and thus covered by the discrimination laws. The facts in *Simpson* were very different, however. The teaching of *Simpson*, if anything, supports the finding that Sidley partners are just that -- partners.

The facts in *Simpson* were extreme. The court of appeals in *Simpson* concluded: "The characterization of 'partner' was a title that carried no legal significance . . . ." 100 F. 3d at 441. Here are the key reasons why:

- Simpson did not share in the firm's profits. He worked on salary. 850 F. Supp. at 660. Every Sidley partner, by contrast, is an equity partner in the Firm with his or her income dependent on the financial performance of the Firm as a whole.

- "Simpson did not invest one cent of his own money in the firm." *Id.* Every Sidley partner, by contrast, has a substantial capital account invested in the Firm.

- "[Simpson] had no authority to sign the firm's name to an audit." *Id.* at 652. Every Sidley partner, by contrast, is a general partner who can and does bind the Firm. Sidley partners (and only partners) sign audit letters and opinion letters.

- "[The merged entity] did not refer to Simpson as a partner, but rather as a 'Party.'" *Id.* at 663. Indeed, Ernst & Young included non-CPAs with CPAs and "state laws prohibit CPAs and non-CPAs from representing themselves as partners." *Id.* at 664. Sidley partners, by contrast, are full partners of the Firm. No one would contend that their partner status was simply "a title that carried no legal significance."

In sum, no case in history has ever applied the ADEA to an equity partner in a bona fide law firm. This Court should follow that settled authority.

LA/675795.7

## V.    CONCLUSION

The EEOC is acting beyond its authority in pursuing this investigation of Sidley under the ADEA.  Because the EEOC's investigation is not within its legislatively-mandated powers, the subpoena should not be enforced.


DATED:  January 8, 2002              Respectfully submitted,


_____
Paul Grossman


PAUL GROSSMAN
ROBERT S. SPAN
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Twenty-Third Floor
555 South Flower Street
Los Angeles, CA  90071-2371
Telephone: (213) 683-6000
Facsimile: (213) 627-0705


_____
Kevin M. Forde


KEVIN M. FORDE
JANICE R. FORDE
KEVIN M. FORDE, LTD.
Suite 1100
111 West Washington Street
Chicago, IL  60602
Telephone: (312) 641-1441
Facsimile:  (312) 641-1288